[Cite as *State v. Stokes*, 2026-Ohio-2580.]

THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

STATE OF OHIO

    Plaintiff - Appellee

-vs-

QUENTIN STOKES

    Defendant - Appellant

Case No. 2025 CA 00085

Opinion And Judgment Entry

Appeal from the Stark County Court of Common Pleas, Case No. 2024CR2383

Judgment:  Affirmed

Date of Judgment Entry: July 6, 2026

BEFORE:   William B. Hoffman, Robert G. Montgomery, and Kevin W. Popham, Judges

APPEARANCES: Kyle L. Stone, Prosecuting Attorney, Christopher A. Piekarski, for Plaintiff-Appellee; George Urban, for Defendant-Appellant

OPINION

*Popham, J.,*

{¶1}  Appellant Quentin Stokes ("Stokes") appeals his conviction and sentence after a jury trial in the Court of Common Pleas for Stark County, Ohio. For the reasons that follow, we affirm.

**Facts and Procedural History**

**The Indictment**

{¶2}  On December 20, 2024, the Stark County Grand Jury indicted Stokes on three counts of strangulation, one count of retaliation, one count of intimidation of an attorney, victim, or witness in a criminal case, one count of disrupting public services, and one count of domestic violence.

**{¶3}** Prior to trial, the State dismissed the retaliation and intimidation charges. (1Tr. 20-21). Following a jury trial, Stokes was acquitted of all three strangulation counts but convicted of disrupting public services and domestic violence. The trial court subsequently sentenced him to an aggregate prison term of two years.

**{¶4}** The charges arose from events occurring on November 8, 2024.

**November 8, 2024, Incident**

**Police Response to the 9-1-1 Call**

**{¶5}** Officer Aminata N'Diaye of the Canton Police Department testified that she was dispatched to a residence on Garaux Street N.E. in Canton, Ohio, in response to a 9-1-1 call reporting a possible domestic violence incident involving victim S.M.

**{¶6}** During the 9-1-1 call, S.M.'s sister informed the dispatcher that S.M. texted her from S.M.'s son's iPad, stating "her son's dad is putting his hands on her and took her phone," and asking that 9-1-1 be contacted. St. Exh. 60. Video footage from Officer N'Diaye's body-worn camera was admitted into evidence.

**{¶7}** Officer N'Diaye testified that upon arriving at the residence, she observed dried blood around the S.M.'s lips. She also detected a strong odor of alcohol and later informed medical personnel that she suspected S.M. was intoxicated.

**{¶8}** Officer Crystal France likewise responded to the scene and arrived while Officer N'Diaye was speaking with S.M. Officer France testified that S.M. appeared upset, frustrated, and emotional. She further testified that S.M. had difficulty speaking and often whispered when attempting to communicate. Officer France also observed blood around the S.M.'s lips.

**{¶9}** While officers investigated, Officer France used her cruiser loudspeaker to direct Stokes and any other occupants to exit the residence. Stokes's uncle, D.S., exited

first and informed officers that Stokes and the parties' minor child remained inside. Stokes subsequently exited the residence and was taken into custody.

{¶10} After D.S. granted officers permission to enter the residence, police conducted a protective sweep to ensure no one else was inside. S.M., was transported by ambulance to Aultman Hospital. Subsequent testing revealed that S.M. had a blood-alcohol concentration of 0.128.

**Medical Treatment and Examination**

{¶11} Officer France later went to the hospital and continued her investigation. She testified that S.M. remained visibly upset, emotional, and had difficulty speaking. Officer France photographed S.M.'s visible injuries, and ten photographs were admitted into evidence.

{¶12} Officer N'Diaye also responded to the hospital and requested that S.M. complete a written statement concerning the incident.[1]

{¶13} Sarah Shaffer, a forensic nurse employed through the Aultman Hospital Serenity Program, testified regarding her examination of S.M. During the narrative-history portion of the examination, S.M. reported that after smoking marijuana outside, her partner became angry and began yelling at her. Shaffer testified that - according to S.M. - after S.M. exited a bathroom at approximately 1:00 a.m., her partner (Stokes) forced the bathroom door into her leg, shoved his thumbs down her throat, and caused significant bleeding and breathing difficulties. Shaffer testified that S.M. further reported that she told Stokes she was dying, but he instead became upset about the blood. Shaffer also testified that S.M. stated that Stokes lifted her by the neck, took her phone

---

[1] The written statement was not admitted into evidence. 2Tr. at 147, St. Exh. 58.

and car keys, and that she later lost consciousness before waking up in bed with no recollection of how she got there.

**{¶14}** According to Nurse Shaffer, S.M. reported that she ultimately used her son's tablet to send a text message to her sister requesting that she contact 9-1-1.

**{¶15}** Nurse Shaffer conducted a physical examination and testified that the injuries she observed were consistent with the history provided by S.M. The parties stipulated to admission of S.M.'s medical records.

**{¶16}** The records documented posterior pharynx petechiae - described as small red spots caused by broken blood vessels in the back of the throat, and bleeding within the oropharyngeal cavity. Nurse Shaffer testified that such findings may be consistent with both strangulation and vomiting. She further testified that the injuries were consistent with S.M.'s reported history. Nurse Shaffer also noted that S.M. exhibited an elevated white blood cell count and remained hospitalized for several days.

**S.M.'s Testimony**

**Initial Reports and Subsequent Recantation**

**{¶17}** Before trial, the trial court granted the State's motion to call S.M. as a court's witness because she had executed an affidavit that contradicted statements she previously made to law enforcement and medical personnel. (2Tr. 14, St. Exh. 59[2]).

**{¶18}** S.M. testified that she and Stokes had been in a relationship for approximately eleven years, that he was the father of her child, and that she continued to care for him.

---

[2] The affidavit was not admitted into evidence. 2Tr. at 147, St. Exh. 59..

**{¶19}** According to S.M., she dropped off their son at Stokes's residence on November 7, 2024, before spending the evening drinking with her sister and visiting local bars. She returned to Stokes's residence sometime between 9:00 p.m. and 10:00 p.m. and continued drinking tequila and smoking marijuana. S.M. testified that marijuana tends to worsen her anxiety, but she used it because she could not afford her preferred vaping products.

**{¶20}** S.M. testified that she could not remember much of the remainder of the evening. She recalled waking up the next morning feeling hungover, experiencing throat pain, and having difficulty breathing. Because she could not locate her phone, she used her son's tablet to ask her sister to contact 9-1-1.

**{¶21}** S.M. testified that her message to her sister did not state that Stokes had assaulted her. She further testified that when officers arrived, she attempted to tell them everything was fine, but they separated her from others and continued their investigation.

**{¶22}** S.M. acknowledged completing a written statement at the hospital. In that statement, she reported that Stokes placed his thumbs down her throat, caused bleeding, took her phone, and that she was unable to swallow. S.M. later recanted those allegations in a sworn affidavit, asserting that she had been intoxicated when she made the earlier statements.

**Jail Calls**

**{¶23}** S.M. testified that she remained in contact with Stokes while he was incarcerated. Portions of several recorded jail calls between the two were admitted into evidence.

**{¶24}** During her testimony, S.M. acknowledged making false statements to Stokes during some of those calls, including statements that her jaw had been wired shut and that she had undergone a rape examination. She also testified that she falsely reported that Stokes became angry when she locked bathroom doors.

**{¶25}** In one recorded call, Stokes referred to the two of them "sticking to a plan." S.M. testified that the statement referred to her efforts to correct what she claimed were false allegations she made while intoxicated.

**Defense Evidence**

**D.S.'s Testimony**

**{¶26}** Stokes's uncle, D.S., testified that Stokes and his son lived with him and that S.M. did not reside at the home.

**{¶27}** According to D.S., he went to bed around 9:00 p.m. on November 7, 2024, and was not awakened by any disturbance during the night. He testified that Stokes woke him the following morning and told him that police were at the front door.

**{¶28}** D.S. testified that when he opened the door, officers immediately ordered him outside. While seated in a police cruiser, he heard officers directing Stokes to exit the residence, which he eventually did.

**{¶29}** D.S. further testified that he declined officers' request to reenter the home with S.M. to retrieve her belongings because he did not want property mistakenly claimed as hers to be removed from the residence.

**{¶30}** According to D.S., members of S.M.'s family later contacted him regarding her missing phone and keys. He testified that S.M., through her sister's Facebook Messenger account, informed him where the phone could be found. D.S. testified that the phone was ultimately located inside a shoebox in a closet and that the keys were

found on a shelf in a sitting area. He acknowledged, however, that he had never previously known S.M. to store her phone in a shoebox.

**Stokes's Testimony**

{¶31} Stokes testified in his own defense.

{¶32} According to Stokes, S.M. dropped off their son earlier on November 7 before spending the evening with her sister and friends. He testified that S.M. returned to the residence after 10:00 p.m. and appeared intoxicated.

{¶33} Stokes testified that when S.M. complained of throat pain the following morning, Stokes was not alarmed because it was not unusual for S.M. to experience vomiting after consuming alcohol. He stated that his primary concern that morning was preparing their son for school, although he also intended to take S.M. to the hospital.

{¶34} Stokes testified that when police arrived, he asked S.M. what was happening, but she offered little explanation. He stated that he told her to go outside and speak with the officers. After officers ordered him to exit the residence over a loudspeaker, he secured the family's pit bull before leaving the home.

{¶35} Stokes testified that he was confused by the officers' presence but complied with their commands and did not resist arrest.

**Verdict and Sentence**

{¶36} Following deliberations, the jury found Stokes not guilty of all three strangulation charges but guilty of disrupting public services and domestic violence. The trial court subsequently sentenced Stokes to an aggregate prison term of two years.

**Assignments of Error**

{¶37} Stokes raises two assignments of error for our consideration.

## I.

**{¶38}** In his first assignment of error, Stokes argues that the trial court committed plain error by permitting jurors to submit written questions to witnesses without providing all the instructional safeguards contemplated by Crim.R. 24(J). Specifically, Stokes contends that the court failed to instruct the jury that it should not draw any adverse inference from the court's refusal to ask a juror's proposed question. We are not persuaded that Stokes has proven plain error.

### Plain Error

**{¶39}** Because Stokes did not object to the procedure employed by the trial court, he has forfeited all but plain error. Crim.R. 52(B).

**{¶40}** Under the plain-error doctrine, an appellant must establish (1) an error, (2) that is plain or obvious, and (3) that affected a substantial right. *State v. Rogers*, 2015-Ohio-2459, ¶ 22. To satisfy the third requirement, the appellant must demonstrate a reasonable probability that, but for the error, the outcome of the proceeding would have been different. *Id.; United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004). Even where those elements are established, an appellate court exercises its authority to recognize plain error only in exceptional circumstances to prevent a manifest miscarriage of justice. *Rogers* at ¶ 23; *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

### Juror Questions

**{¶41}** The practice of permitting jurors to question witnesses rests within the trial court's discretion. *State v. Fisher*, 2003-Ohio-2761, ¶ 29. In *Fisher*, the Supreme Court of Ohio recognized several concerns associated with juror questioning, including the risk

of improper questions, reluctance by counsel to object in the jury's presence, disruption of courtroom procedure, and the potential erosion of juror impartiality. *Id*. at ¶ 24.

{¶42} To address those concerns, the Court approved safeguards that include requiring jurors to submit questions in writing, permitting counsel to raise objections outside the jury's presence, and requiring questions to be submitted only after counsel have completed their examinations. *Id*. at ¶ 25.

{¶43} Following *Fisher*, Crim.R. 24(J) was adopted to govern juror questions. Relevant here, Crim.R. 24(J)(7) provides that if a proposed juror question is not asked, the trial court shall instruct the jurors that they are not to draw any adverse inference from the court's refusal to ask the question.

**Application**

{¶44} At the conclusion of S.M.'s testimony, the jurors submitted written questions to the trial court. The court asked three of the proposed questions but declined to ask one. (2Tr. 104-106). The court did not thereafter instruct the jury that it should not draw any adverse inference from the court's refusal to ask the omitted question.

{¶45} Assuming, without deciding, that the trial court erred by failing to provide the instruction contemplated by Crim.R. 24(J)(7), Stokes cannot establish that the omission affected his substantial rights.

{¶46} Stokes does not identify any adverse inference that the jury allegedly drew from the court's refusal to ask the proposed question. Nor does he explain how the absence of the instruction prejudiced his defense or created a reasonable probability of a different outcome. Rather, his argument rests entirely upon speculation.

{¶47} Likewise, the record provides no basis for concluding that the jury's verdict was affected by the omission. Significantly, the jury acquitted Stokes of the three most

serious charges submitted for its consideration. Those acquittals undermine any claim that the jury improperly inferred that the unanswered question reflected negatively upon the defense or otherwise deprived Stokes of a fair trial.

{¶48} On this record, we cannot conclude that there is a reasonable probability that the outcome of the trial would have been different had the instruction been given. Accordingly, Stokes has failed to satisfy the prejudice requirement necessary to establish plain error.

**Conclusion**

{¶49} Stokes has failed to demonstrate that the trial court's omission of the instruction set forth in Crim.R. 24(J)(7) affected his substantial rights or created a reasonable probability of a different outcome. Nor has he established the type of exceptional circumstance warranting the exercise of our discretionary authority to recognize plain error.

{¶50} Accordingly, Stokes's first assignment of error is overruled.

## II.

{¶51} In his second assignment of error, Stokes argues that his convictions are against the manifest weight of the evidence. We disagree.

### Standard of Review, Manifest Weight of the Evidence

{¶52} A manifest-weight challenge concerns the persuasive force of the evidence. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. The relevant inquiry is whether the greater amount of credible evidence supports one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶53} In conducting a manifest-weight review, an appellate court sits as a "thirteenth juror" and independently reviews the entire record, weighs the evidence and

all reasonable inferences, considers witness credibility, and determines whether the jury clearly lost its way and created a manifest miscarriage of justice. *State v. Jordan*, 2023-Ohio-3800, ¶ 17; *Thompkins* at 387. Reversal on manifest-weight grounds is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Thompkins* at 387.

{¶54} Even so, substantial deference is afforded to the factfinder's credibility determinations. Because the jury personally observes the witnesses' demeanor, voice inflections, and manner of testifying, it is in the best position to evaluate credibility. *Eastley* at ¶ 21; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶55} Additionally, the Ohio Constitution requires the unanimous concurrence of all three appellate judges before a conviction may be reversed as against the manifest weight of the evidence. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4.

**Application**

**Domestic Violence Conviction**

{¶56} Stokes was convicted of domestic violence in violation of R.C. 2919.25(A), which prohibits knowingly causing or attempting to cause physical harm to a family or household member. "Physical harm to persons" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶57} Ohio courts have repeatedly recognized that physical harm may be established even in the absence of severe or lasting injury. See *State v. Cook*, 2021-Ohio-3841, ¶ 11 (1st Dist.); *In re A.T.*, 2021-Ohio-2934, ¶ 67 (8th Dist.); *State v. Perkins*, 1998 Ohio App. LEXIS 1213 (11th Dist. Mar. 27, 1998). The slightest injury, or even the infliction of pain, may satisfy the statutory definition.

**{¶58}** Here, the jury was presented with substantial evidence that S.M. suffered physical harm. Responding officers observed blood around her mouth and noted that she was emotional and had difficulty speaking. Photographs documenting her condition were admitted into evidence. The jury also received medical records and heard testimony from Nurse Shaffer, who documented bleeding within S.M.'s throat and petechiae in the posterior pharynx. Nurse Shaffer testified that these findings were consistent with the history S.M. provided during her examination.

**{¶59}** Although S.M. later recanted portions of her earlier allegations, the jury heard evidence regarding both her initial statements and her subsequent recantation. The jury also heard testimony concerning her intoxication on the night of the incident and her continued relationship with Stokes.

**{¶60}** Stokes argues that S.M. lacked credibility because she was intoxicated, changed her account over time, and admitted making false statements during jail calls. He further contends that the medical evidence was consistent with non-criminal explanations.

**{¶61}** Those arguments were presented to the jury. The jury was free to believe all, part, or none of any witness's testimony. *State v. Petty*, 2017-Ohio-1062, ¶ 63 (10th Dist.); *State v. Davis*, 2024-Ohio-1504, ¶ 60 (5th Dist.). Moreover, conflicting evidence does not render a conviction against the manifest weight of the evidence. *State v. Morris*, 2018-Ohio-5252, ¶ 51 (10th Dist.).

**{¶62}** The jury had the opportunity to observe S.M. and Stokes firsthand, evaluate their credibility, and weigh the competing explanations for S.M.'s injuries. We cannot conclude that the jury clearly lost its way in finding that Stokes knowingly caused physical harm to S.M.

**Disrupting Public Services Conviction**

{¶63} Stokes also challenges his conviction for disrupting public services.

{¶64} R.C. 2909.04(A) prohibits conduct that interrupts or impairs the ability of another to use public services, including emergency communications. The Supreme Court of Ohio has recognized that the destruction or concealment of a cellular telephone may constitute conduct prohibited by the statute. *State v. Robinson*, 2009-Ohio-5937, ¶ 29. As this Court has noted, the statute is intended to prevent conduct that interferes with a victim's ability to seek emergency assistance. *State v. Galindo*, 2012-Ohio-3626, ¶ 17 (5th Dist.).

{¶65} The jury heard evidence that S.M. was unable to locate her cellular telephone on the morning of the incident and instead used her son's tablet to send a message to her sister requesting that she call 9-1-1. S.M. initially reported to police and medical personnel that Stokes had taken her phone. Nurse Shaffer testified that S.M. reported during her examination that Stokes took both her phone and her keys. S.M. likewise testified that she told police on the day of the incident that Stokes had possession of her phone when she wanted to contact law enforcement.

{¶66} The jury also heard evidence concerning the phone's eventual discovery. D.S. testified that the phone was located inside a shoebox in a closet after S.M. identified its location through messages sent from her sister's Facebook Messenger account. D.S. further testified that he had never known S.M. to keep her phone in a shoebox.

{¶67} To be sure, conflicting evidence existed. S.M. later testified that she no longer believed Stokes had taken her phone because both were searching for it that morning. Stokes likewise denied placing the phone in the shoebox.

**{¶68}** Again, however, it was the jury's role to resolve those conflicts. The jury could reasonably credit S.M.'s contemporaneous statements to police and medical personnel over her later recantation. It could likewise infer from the evidence that Stokes concealed the phone, thereby preventing S.M. from contacting emergency services and forcing her to seek assistance through her son's tablet.

**{¶69}** The record therefore contains competent, credible evidence supporting the jury's verdict on the disrupting-public-services charge.

**{¶70}** The jury's verdict further supports this conclusion. Although the jury found Stokes guilty of domestic violence and disrupting public services, it acquitted him of all three strangulation charges. The mixed verdict demonstrates that the jury carefully evaluated each charge and did not simply accept the State's evidence wholesale. Rather, it reflects a deliberate assessment of the evidence and witness credibility as to each offense.

**Conclusion**

**{¶71}** This is not the exceptional case in which the evidence weighs heavily against conviction. The jury was presented with competing versions of events, corroborating physical evidence, medical testimony, and evidence bearing on witness credibility. After independently reviewing the entire record, we cannot conclude that the jury clearly lost its way or created a manifest miscarriage of justice.

**{¶72}** Accordingly, Stokes's convictions are not against the manifest weight of the evidence, and his second assignment of error is overruled.

**{¶73}** The judgment of the Court of Common Pleas for Stark County, Ohio is affirmed. Costs to be paid by appellant Quentin Stokes.

By: Popham, J.

And Montgomery, J., concur

Hoffman, P.J., concurs separately

*Hoffman, P.J., concurring*

{¶74}  I fully concur in the majority opinion.

{¶75}  I write separately only to note with regard to Appellant's first assignment of error, I determine it was error not to instruct the jury not to draw any adverse inference from the court's refusal to ask a juror's proposed question.  However, I find such error was not only not plain error, as does the majority, but also harmless error in this case.